153 P.3d 1091

Charles BROOKS and Donna Brooks,
Plaintiffs–Appellees,

v.

DANA NANCE & CO. and Fidelity National Field Services, Inc., successor to Chicago Title Co., Inc., Defendants–Appellants/Cross–Claimants–Appellants/Cross–Claim Defendants,

and

Seasons Mortgage, Inc., Defendant–Appellee/Cross–Claim Defendant–Appellee/Cross–Claimant,

and

ACS Government Services, Inc. fka Computer Data Systems, Inc. aka CDSI, Defendant.

No. 26736.

Supreme Court of Hawai'i.

Jan. 12, 2007.

Michael L. Lam, Lauren R. Sharkey, Seth R. Harris (of Case Bigelow & Lombardi), on the briefs, Honolulu, for defendants-appellants/cross-claimants-appellants/cross-claim defendants Dana Nance & Co. and Fidelity National Field Services, Inc.

Elton John Bain and E. Mason Martin III (of Kessner Duca Umebayashi Bain & Matsunaga), on the briefs, Honolulu, for defendant-appellee/cross-claim defendant-appellee/cross-claimant Seasons Mortgage, Inc.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; and ACOBA, J., dissenting.

Opinion of the Court by LEVINSON, J.

The defendants-appellants/cross-claimants-appellants/cross-claim defendants Dana Nance & Company (Nance) and Fidelity National Field Services (Fidelity) [hereinafter, collectively, the Appellants], appeal from the July 20, 2004 order of the circuit court of the second circuit, the Honorable Joel E. August presiding, granting the defendant-appellee/cross-claim defendant-appellee/cross-claimant Seasons Mortgage, Inc.'s (Seasons) petition for a determination of a good faith settlement with the plaintiffs-appellees Charles and Donna Brooks (collectively, the Brookses).

On appeal, the Appellants assert that the circuit court: (1) abused its discretion by determining, as required by Hawai'i Revised Statutes (HRS) § 663–15.5(b) (Supp.2003),[1] that the settlement between Seasons and the Brookses was made in good faith; and (2) erred by dismissing the Appellants' cross-claim against Seasons despite the existence of a written indemnity agreement between Seasons and Fidelity.

For the reasons discussed *infra* in section III.A., we lack jurisdiction to directly address the Appellants' appeal, brought pursuant to HRS § 641–1 (1993),[2] of the dismissal of their cross-claim, but we nevertheless analyze the merits and vitality of the cross-claim

---

1. HRS § 663–15.5, entitled "Release; joint tortfeasors; co-obligors; good faith settlement," provides in relevant part:

 (b) For purposes of subsection (a) [setting forth the rights of non-settling joint tortfeasors and co-obligors with regard to settlement agreements], any party shall petition the court for a hearing on the issue of good faith of a settlement entered into by the plaintiff ... and one or more alleged tortfeasors....

 . . . .

 (d) *A determination by the court that a settlement was made in good faith shall:*

 (1) *Bar any other joint tortfeasor ... from any further claims against the settling tortfeasor ..., except those based on a written indemnity agreement; and*

 (2) *Result in a dismissal of all cross-claims filed against the settling joint tortfeasor ..., except those based on a written indemnity agreement.*

 (e) A party aggrieved by a court determination on the issue of good faith may appeal the determination....

 . . . .

 (Emphases added.)

2. HRS § 641–1 provided in relevant part:

 (a) Appeals shall be allowed in civil matters from all final judgments, orders, or decrees of circuit ... courts ... to the supreme court .. except as otherwise provided by law....

 . . . .

 (c) An appeal shall be taken in the manner and within the time provided by the rules of court.

 Effective July 1, 2006, the legislature amended HRS § 641–1 in a manner immaterial to the present appeal. *See* 2004 Haw. Sess. L. Act 202, §§ 66 and 85 at 943 and 948.

insofar as it informs our analysis, undertaken pursuant to HRS § 663–15.5(e), *see supra* note 1, of the circuit court's determination that the settlement was made in good faith. Furthermore, for the reasons discussed *infra* in section III.B. and thereafter, we hold that the circuit court abused its discretion in determining that the settlement between Seasons and the Brookses was made in good faith and, accordingly, vacate the July 20, 2004 order concerning that determination and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual Background

In May 1997, the United States Veterans Administration (VA), which held a mortgage on the Brookses' home on Maui, contracted with Computer Data Systems, Inc. (CDSI) to manage the mortgage, and, in September 1997, CDSI—later ACS Government Solutions—subcontracted with Seasons to service the mortgage payments. As part of the contract with CDSI, Seasons was obligated to preserve from neglect or abandonment properties subject to CDSI mortgages. Also in May 1997, Seasons contracted with Universal Mortgage Services, Inc. (Universal)—which, through acquisition and rebranding, became Fidelity—to perform preservation and maintenance work on mortgaged properties in default or which had been abandoned. The agreement between Seasons and Universal contained the following indemnification clause:

> [Seasons] and Universal each agree to indemnify, defend and hold harmless the other party ... from any and all loss ... arising from the violation of any law or regulation by the party in its performance under this Agreement, compliance with the other party's instructions and requests, and the negligence on the part of a party ... in the performance of this Agreement.
>
> .... Neither Universal [nor] its inspectors ... will be held accountable for any error ... in completing the inspection un-

less such error ... is made in bad faith by the inspector.

One of the properties managed by Seasons was the Brookses' home. Beginning in December 1997, payments on the mortgage fell into dispute, leading Seasons to instruct Fidelity to perform monthly inspections of the property. Seasons contends that, by July 1998, the Brookses had defaulted, and Fidelity subsequently informed Seasons that Fidelity's agent, Nance, had determined that the property had fallen vacant and was deteriorating. In response, Seasons instructed Fidelity to secure the property, and so, between November 1998 and early 1999, Nance changed the lock on the front door, boarded up a broken window and removed extensive debris from both inside and outside the home, including several apparently abandoned vehicles.

Meanwhile, on June 1, 1998, the division of the VA that managed the Brookses' mortgage had written to CDSI to acknowledge Nance's reports but, at the same time, to instruct CDSI that no "securing, board up [or] clean up" should take place, because the Honolulu office was in contact with the Brookses and generally did not perform such actions until foreclosure was completed. There is evidence in the record reflecting that the VA also directed the same instruction to Seasons at the same time.

In late January 1999, several days after Fidelity oversaw the last removal work, Seasons instructed Fidelity to "return all items to their original locations and to stop any further work." Fidelity was evidently unable to locate and return much of the seized property, including the seized vehicles.

### B. Procedural Background

On August 21, 2003, the Brookses filed a first amended complaint against the Appellants and Seasons alleging burglary, intentional infliction of emotional distress (IIED), unfair and deceptive trade practices, and conversion and seeking total damages of twenty-five million dollars.[3] They also alleged that the defendants had engaged in the actions at

---

**3.** The first amended complaint also named CDSI as a defendant, but the company was later dis- missed from the action as to all four counts.

issue based on the Brookses' African–American ethnicity, "in violation of the Fair Housing Act of 1968, Title VIII, as amended, and the laws of the State of Hawai['.]i and the United States." The circuit court subsequently: (1) dismissed the burglary and unfair and deceptive trade practices claims; (2) in regard to the conversion claim, dismissed "any reference therein to alleged violations of the Fair Housing Act of 1968, title VIII, and racial discrimination and/or related state or federal laws"; and (3) in regard to the IIED claim, struck "any allegations or references contained therein which concern or relate to alleged violations of state or federal constitutional rights." On November 20, 2003, Fidelity filed a cross-claim against Seasons for contribution and indemnification. On December 8, 2003, Seasons responded with a cross-claim against the Appellants for contribution and indemnification for the actions undertaken on its behalf, apparently in part alleging bad faith on the Appellants' part in carrying out the inspections.[4]

Seasons entered into settlement negotiations with the Brookses, overseen by the Honorable E. John McConnell (Retired). In their April 15, 2004 settlement conference statement, the Brookses (1) asserted damages in excess of $1,800,000.00, including property losses totaling $126,000.00, $500,000.00 in claims of lost profits from lost business opportunities resulting from the seizures, and $200,000.00 in connection with the IIED claims and (2) demanded a minimum settlement of $500,000.00 plus $150,000.00 in attorney's fees. By April 22, 2004, the settlement demand had fallen to $200,000.00 and, after Seasons tendered a settlement offer of $100,000.00 on May 12, 2004 in return for a release of all claims against Seasons and for indemnification by the Brookses in favor of Seasons for all claims arising from the matter, the Brookses evidently accepted because, on June 21, 2004, Seasons filed a petition with the circuit court for a determination of a good faith settlement.

On June 29, 2004, the circuit court conducted a hearing on Seasons's petition. With

regard to the good faith determination, the court observed:

I have looked at *Troyer v. Adams*[, 102 Hawai'i 399, 77 P.3d 83 (2003) ], which talks about the totality of the circumstances which the court is supposed to look at to determine whether a settlement was made in good faith. . . . [T]his is up to the discretion of the court to make this determination, but they list a number of sample criteria. . . .

And, quite frankly, I think the realistic approximation of the total damages has been one of the great difficulties in this case, because there has been, I think, very little in terms of hard evidence as to what the special damages are, and I think that's difficult for everyone. . . .

Here, I don't think we have an issue of collusion or anything like that.

And some other evidence that the settlement is aimed at injuring the interests of a non-settling tortfeasor or motivated by wrongful purpose. I certainly don't see any evidence of that.

With regard to the amount, given how difficult it has been to come up with hard evidence of special damages . . .—and given the last demand of the Brookses, which I think, under the circumstances, was . . . quite reasonable in light of what some of the possibilities are if a verdict is in their favor[—] I don't think that the amount that is being proposed here is improper or inadequate in any way.

. . . .

. . . . I don't have a problem with the hundred thousand dollars being a reasonable amount in light of all the totality of the circumstances.

. . . .

So I'm basically finding that this settlement was made in good faith.

In reaching its conclusion, the circuit court considered the relative degree of fault borne by Seasons, remarking that

I know that there is a dispute among the tortfeasors about the . . . *question of who's* at fault here, if anybody is. . . . [B]ut . . .

4. By August 12, 2003, Seasons had become insolvent, and its representation had evidently been assumed by its insurance carrier, Montgomery Insurance Group.

the key issue here is ... we have, so far as the court can see from the documents, ... a mutual indemnity agreement. And to me, that is the key issue, because ... you have got a section of the law which talks about preserving the rights of an indemnity agreement in [HRS § ]663–15.5[ (d)(1), *see supra* note 1].

I don't think there is really any question here that there is an indemnity agreement between the two alleged joint tortfeasors. And when I looked at [HRS § ]663–15.5(d), it's very clear that ... *if I determine that this settlement is made in good faith ... it does not bar any claims among the joint tortfeasors based on a written indemnity agreement, and it does not result in dismissal of cross-claims based on a written indemnity agreement.*

. . . .

Now, I understand that an argument has been made here about the fact that ... if the parties acted in bad faith, then you don't have to worry about the indemnity agreement. But the question about whether someone has acted in bad faith or not is really a jury question. . . .

... I don't know what the jury's going to decide. So I can't go ahead and make a ruling that ... throws out the indemnity clause and makes that ineffective in light of the current circumstances.

... [O]nce the jury has made a decision, then the court ultimately is going to have to make a final decision about the effect of the indemnity clause, but I can't do that now.

(Emphasis added.) Seasons's counsel made it clear, however, that, without dismissal of the Appellants' cross-claims against Seasons, there would be no settlement. The court then struggled to balance the factors weighing in favor of a determination of good faith with what it recognized were reasonable arguments made by the Appellants' counsel, Michael Lam, that, pursuant to HRS § 663–15.5(d)(1), the Appellants' cross-claims could not be dismissed as part of the good faith settlement:

The Court: Well, look. I can decide that it's unconditional at this point. Okay? But if the jury comes in and decides negligence, then you have got—the court will then deal, I suppose, with—if they bring in some kind of a motion for their attorney's fees and costs, the court will deal with that in light of the fact that the court is making a finding that this settlement was made in good faith, and the amount you paid out, and in light of the fact that there is a mutual indemnity clause. I'm not saying how I would rule, but I would take all that into account.

. . . .

Well, I think—in light of the fact that the only claims that are still alive in this case are intentional torts, I think—you know, the more the court has thought about that, the more appropriate it would be to make this unconditional. And depending on what findings are made by the jury, [the Appellants] may then be bringing motions before the court with regard to the issue of indemnity ... after trial.

. . . .

Mr. Lam: All right, your Honor. So long as the order or the decision by the court's clear that our cross-claim still exists.

The Court: Well, I'm making it unconditional at this point.

Mr. Lam: So are you barring our cross-claims?

The Court: No.

Mr. Lam: Well, that's what I'm saying, is that you can—

The Court: Well, they are barred ... subject to some motions made after the findings ... unless there are findings which are made by the jury which would cause the court to reverse its decision later on. . . .

So I'm basically finding that this settlement was made in good faith, and ... there are no ... active cross-claims.

On July 20, 2004, the circuit court entered an order granting Seasons's petition, determining that the $100,000.00 settlement was made in good faith, and discharging and dismissing with prejudice the Appellants' cross-claim against Seasons. Evidently, soon

thereafter, the Appellants settled with the Brookses for $125,000.00.

The Appellants filed two timely notices of appeal on July 28, 2004, one, filed pursuant to HRS § 663–15.5(e), *see supra* note 1, appealing the order determining that the settlement was made in good faith, and the other, filed pursuant to HRS § 641–1, *see supra* note 2, appealing the circuit court's dismissal of their cross-claims against Seasons.

## II. STANDARDS OF REVIEW

### A. Determination Of A Good Faith Settlement

■ [T]he determination of whether a settlement is in good faith [is left] to the sound discretion of the trial court in light of the totality of the circumstances surrounding the settlement.... On appeal, the trial court's determination will be reviewed for abuse of discretion.

*Troyer,* 102 Hawai'i at 427, 77 P.3d at 111. An appellate court should consider the decision "in light of all of the relevant circumstances extant at the time of settlement." *Id.* at 402, 77 P.3d at 86.

■ "An abuse of discretion occurs when the decisionmaker 'exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *In re Water Use Permit Applications,* 94 Hawai'i 97, 183, 9 P.3d 409, 495 (2000) (quoting *Bank of Hawai'i v. Kunimoto,* 91 Hawai'i 372, 387, 984 P.2d 1198, 1213 (1999)), *quoted in State v. Wilmer,* 97 Hawai'i 238, 243, 35 P.3d 755, 760 (2001); *State v. Vliet,* 95 Hawai'i 94, 108, 19 P.3d 42, 56 (2001).

### B. Appellate Jurisdiction

■ [I]t is axiomatic that we are "under an obligation to ensure that [we have] jurisdiction to hear and determine each case and to dismiss an appeal on [our] own motion where [we] conclude [we] lack[ ] jurisdiction." *BDM, Inc. v. Sageco, Inc.,* 57 Haw. 73, 73, 549 P.2d 1147, 1148 (1976). "When we perceive a jurisdictional defect in an appeal, we must, *sua sponte,* dismiss that appeal." *Familian Northwest, Inc. v. Cent[.] Pac[.] Boiler & Piping, Ltd.,* 63 Haw. 368[, 369], 714 P.2d 936, 937 (1986). *Bacon v. Karlin,* 68 Haw. 648, 650, 727 P.2d 1127, 1129 (1986) (some brackets added and some in original).

## III. DISCUSSION

### A. This Court Lacks Jurisdiction To Address The Dismissal Of The Appellants' Cross–Claims Brought Under HRS § 641–1.

■ As noted *supra* in section I.B., the Appellants filed their appeal of the circuit court's dismissal of their cross-claims pursuant to HRS § 641–1, *see supra* note 2. The July 20, 2004 final order, however, was not reduced to a separate judgment as required by Hawai'i Rules of Civil Procedure (HRCP) Rule 58[5] and is, therefore, not appealable under HRS § 641–1. *See Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 119, 869 P.2d 1334, 1338 (1994) (holding that "[a]n appeal may be taken from circuit court orders resolving claims against parties only after the orders have been reduced to a judgment and the judgment has been entered in favor and against the appropriate parties pursuant to HRCP [Rule] 58" and announcing that "[a]n appeal from an order that is not reduced to a judgment in favor of or against the party by the time the record is

---

5. HRCP Rule 58 provides:
 Unless the court otherwise directs and subject to the provisions of Rule 54(b), judgment upon the verdict of a jury shall be entered forthwith by the clerk; but the court shall direct the appropriate judgment to be entered upon a special verdict or upon a general verdict accompanied by answers to interrogatories returned by a jury pursuant to Rule 49. When the court directs that a party recover only money or costs or that all relief be denied, the clerk shall enter judgment forthwith upon

receipt by him of the direction; but when the court directs entry of judgment for other relief, the judge shall promptly settle or approve the form of the judgment and direct that it be entered by the clerk. The filing of the judgment in the office of the clerk constitutes the entry of the judgment; and the judgment is not effective before such entry. The entry of the judgment shall not be delayed for the taxing of costs. Every judgment shall be set forth on a separate document.

filed in the supreme court will be dismissed"). Therefore, we lack appellate jurisdiction to address any of the Appellants' points of error aside from the determination of good faith, which was brought pursuant to HRS § 663–15.5(e), *see supra* note 1.

■ We note that the plain language of HRCP Rule 58, *see supra* note 5, requires that the court enter judgment, which "shall be set forth on a separate document," (1) upon the verdict of a jury, (2) when a court "directs that a party recover only money or costs or that all relief be denied," or (3) "when the court directs entry of judgment for other relief." Inasmuch as the circuit court, in making its *determination* of good faith, did not "deny" any relief at all (but rather allowed the settlement to proceed) nor, as it pertains to the good faith settlement, did it direct entry of judgment for other relief, but merely made a determination of the settlement's good faith character, none of the three categories in HRCP Rule 58 apply. The requirement, therefore, pursuant to HRCP Rule 58 and *Jenkins,* that the order or judgment "be set forth on a separate document" is inapplicable to the good faith determination process described in HRS § 663–15.5. Rather, the right of appeal[6] under HRS § 663–15.5(e) is distinct and independent under that statutory authority.[7]

■ Finally, insofar as a review of the good faith determination entails analysis of the indemnification clause and the strength and vitality of the Appellants' cross-claim against Seasons, this court has jurisdiction under HRS § 663–15.5(e) to do so.

B. *Good Faith Settlements And The Troyer Test*

In *Troyer,* this court confronted, as a matter of first impression, the question whether a settlement was made in good faith pursuant to the requirements of the newly enacted HRS § 663–15.5, and concluded

> that the legislature's goals of simplifying the procedures and reducing the costs associated with claims involving joint tortfeasors, while providing courts with the opportunity to prevent collusive settlements aimed at injuring non-settling tortfeasors' interests, are best served by leaving the determination of whether a settlement is in good faith to the sound discretion of the trial court in light of the totality of the circumstances surrounding the settlement.

102 Hawai'i at 427, 77 P.3d at 111. With respect to assessing the totality of the circumstances, we stated that

> the trial court may consider the following factors to the extent that they are known at the time of settlement: (1) the type of case and difficulty of proof at trial ...; (2) the realistic approximation of total damages that the plaintiff seeks; (3) the strength of the plaintiff's claim and the realistic likelihood of his or her success at trial; (4) the predicted expense of litigation; (5) the relative degree of fault of the settling tortfeasors; (6) the amount of consideration paid to settle the claims; (7) the insurance policy limits and solvency of the joint tortfeasors; (8) the relationship among the parties and whether it is conducive to collusion or wrongful conduct; and (9) any other evidence that the settlement is aimed at injuring the interests of a non-settling tortfeasor or motivated by other wrongful purpose. The foregoing list is not exclusive, and the court may consider any other factor that is relevant to whether a settlement has been given in good faith.

*Id.*

*Troyer* rejected the good-faith test articulated in *Tech–Bilt, Inc. v. Woodward–Clyde*

---

6. The use of the word "may" in the language of HRS § 663–15.5(e), *see supra* note 1, clearly denotes that the choice of appealing the determination rests, as it should, with the parties to the lawsuit.

7. Indeed, as we noted in *Troyer,* the legislature's purpose behind enacting HRS § 663–15.5 was, *inter alia,* " 'to simplify the procedures and reduce the costs associated with claims involving joint tortfeasors by ... [e]stablishing a good faith settlement procedure for joint tortfeasors....' " 102 Hawai'i at 414, 77 P.3d at 98 (quoting Hse. Stand. Comm. Rep. No. 1230, in 2001 House Journal, at 1599) (emphasis omitted). Part of that new good faith settlement procedure was the creation, through HRS § 663–15.5(e), of an independent right of appeal of a good faith determination separate from HRS § 641–1.

*& Assocs.*, 38 Cal.3d 488, 213 Cal.Rptr. 256, 698 P.2d 159 (1985), that would "require that trial courts conduct 'mini-trials' in order to determine the parties' likely proportionate liability," *Troyer,* 102 Hawai'i at 426, 77 P.3d at 110, in part because "the [Hawai'i] legislature expressly declared its intent to 'simplify the procedures and reduce the costs associated with claims involving joint tortfeasors,' " *id.* (quoting Hse. Stand. Comm. Rep. No. 1230, in 2001 House Journal, at 1599 and noting that "[t]his legislative purpose would be difficult to accomplish" under the *Tech–Bilt* test).

Analyzing the structure and history of Act 300, which became HRS § 663–15.5,[8] and comparing it to the law that preceded it, we observed that, in passing Act 300, "our legislature abandoned a statutory scheme that afforded a non-settling joint tortfeasor greater protection," 102 Hawai'i at 426, 77 P.3d at 110. Rather, we concluded, the legislature was "more interested in encouraging settlements than making an attempt of doubtful effectiveness to prevent inequitable settlements" because the history and structure of HRS § 663–15.5 suggested that "the legislature[ ] . . . was more interested in encouraging settlements than ensuring the equitable apportionment of liability." *Id.*

■ Therefore, while, under the totality of the circumstances test, " 'courts are free to police collusive settlements that unfairly saddle one tortfeasor with a disproportionate share of liability,' " by " 'enabl[ing] the trial court to consider the potential proportionate liability of the parties in cases where such determinations are appropriate,' " the test " 'does not require the court to consider it in every case.' " *Troyer,* 102 Hawai'i at 424, 77 P.3d at 108 (quoting *Mahathiraj v. Columbia Gas of Ohio, Inc.,* 84 Ohio App.3d 554, 617 N.E.2d 737, 741–42 (1992)).

### C. *The Parties' Arguments Regarding The Circuit Court's Good Faith Determination*

The Appellants argue that the relative degree of fault between Seasons and the Appel-

lants, the total damages sought by the Brookses, and the final consideration paid by Seasons demonstrate, in combination, that the circuit court abused its discretion in approving the settlement. They assert that, because the Appellants' actions giving rise to the Brookses' lawsuit were undertaken as a result of "strict instructions" from Seasons, Seasons would, in the end, be liable for any damages arising from its failure to convey to Fidelity the VA's instructions to refrain from entering the property. In addition, the Appellants note that the Brookses initially prayed for $25,000,000.00 in their first amended complaint and sought $650,000.00 in their April 15, 2004 settlement conference statement and, apparently relying on settlement documents, contend that, at trial, the Brookses would have asked the jury for "no less than a million dollars in damages," whereas, shortly after May 12, 2004, they accepted an offer to fully release Seasons from all claims in return for $100,000.00. They contend that the granting of Seasons's petition for settlement drove them, in turn, to settle with the Brookses for $125,000.00 [9] and maintain that the fact that they had to settle for more than Seasons supports their contention that Seasons's settlement with the Brookses was not in good faith because, despite having merely done Seasons's express bidding, in the end they "had to bear the majority of the amounts paid in settlement."

Construing its argument liberally, Seasons responds that the Brookses' remaining intentional tort claims, if based on a theory of racial discrimination, were groundless because no agent of Seasons ever knew that the Brookses were African–American and, by implication, that the Brookses, having failed to allege any other motive for the intentional acts of conversion and IIED, would necessarily lose at trial. Seasons apparently argues that, therefore, any dispute between the Appellants and Seasons over relative fault would be irrelevant.

■ Seasons also contends that, given the Brookses' chances at trial, $100,000.00 was a reasonable settlement sum. Seasons asserts that, in order to prevail at trial on both the conversion and the IIED claims, the

---

8. *See* 2001 Haw. Sess. L. Act 300, §§ 1 and 7 at 875–77.

9. Seasons contends that the settlement was for $135,000.00.

Brookses would, *inter alia,* have to establish the value of the property converted as well as the value of the emotional damage they suffered as a result of Seasons's actions. Seasons asserts that, as of the time of settlement shortly before trial, the Brookses had not named any experts either (1) to value the property lost or damaged in the incident or (2) to assess their emotional distress claims.[10] Seasons notes, furthermore, that, by April 22, 2004, the Brookses' settlement demands had dropped to $200,000.00 and that the Brookses themselves, in a report to their insurance company, estimated the value of their property at the time of its loss to be $116,000.00. Seasons contrasts that estimate with its settlement payment of $100,000.00, arguing that it was both significant, given that Seasons contested both liability and damages, and reasonable, given foreseeable litigation costs at trial and the fact that, by the time of settlement, Seasons was insolvent.

Finally, Seasons contends that, under Hawai'i law, there is no right of contribution or indemnity between joint intentional tortfeasors, citing *Whirlpool Corp. v. CIT Group/ Bus. Credit, Inc.,* 293 F.Supp.2d 1144 (D.Haw.2003),[11] and, accordingly, the only two remaining claims for relief in the lawsuit sounding in intentional torts, that the Appellants' cross-claim was groundless.

D. *The Circuit Court Abused Its Discretion In Determining That The Settlement Between Seasons And The Brookses Was In Good Faith.*

1. *The amount of the settlement was reasonable in light of the nature and strength of the Brookses' claims.*

In order to establish Seasons's liability for conversion, the Brookses would have to prove, *inter alia,* that Seasons had "a constructive or actual intent to injure" the Brookses' interest in the property by entering the lot and removing the items. *See Iddings v. Mee-Lee,* 82 Hawai'i 1, 9, 919 P.2d 263, 271 (1996) ("the commission of an intentional tort includes a constructive or actual intent to injure") (quoting *Pleasant v. Johnson,* 312 N.C. 710, 325 S.E.2d 244, 249 (1985)); *Pac. Mill Co. v. Enter. Mill Co.,* 16 Haw. 282, 284, 286 (1904) (approving a jury instruction that "conversion is the exercise of dominion over an article with intent to repudiate the ownership of the true owner and in defiance of his rights").

An IIED claim requires the plaintiff to establish "[ (]1) that the conduct allegedly causing the harm was intentional or reckless[; (]2) that the conduct was outrageous[;] and [ (]3) that the conduct caused [ (]4) extreme emotional distress to another." *Hac v. Univ. of Hawai'i,* 102 Hawai'i 92, 95, 73 P.3d 46, 49 (2003) (adopting the elements of IIED prescribed by the Restatement (Second) of Torts). " '[I]ntent' is used throughout the Restatement ... to denote that the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it." Restatement (Second), *supra,* § 8A.

In our view, the record reflects that the Brookses' case against Seasons for both conversion and IIED was reasonably strong, even absent proof of racial motivation. There is evidence in the record tending to establish that Seasons was aware of the VA's instructions, but that Seasons nevertheless ordered Fidelity to enter and secure the

---

10. The Brookses, in their final list of witnesses filed on February 20, 2003, did name, *inter alia,* four individuals who arguably could testify to damages: three individuals who would testify "[a]s to the facts and circumstances of [the] case and [the Brookses'] lo[s]ses" and Mr. Brooks's psychiatrist, with whom he "discussed" the incident. As an aside, "while we have stated in the past that ... supporting expert or medical testimony" is not a prerequisite to a claim of infliction of emotional distress, such evidence "may nevertheless be *relevant* to establishing the existence of 'serious' emotional distress as a response to a tortious event." *Tabieros v. Clark*

*Equip. Co.,* 85 Hawai'i 336, 361–62, 944 P.2d 1279, 1304–05 (1997) (emphasis in original); *see also Campbell v. Animal Quarantine Station,* 63 Haw. 557, 564, 632 P.2d 1066, 1071 (1981) (approving proposition that "medical testimony [is] not necessary to substantiate plaintiffs' claims of serious emotional distress").

11. Seasons cites erroneously to an opinion by the same name, 258 F.Supp.2d 1140 (D.Haw.2003), announced six months earlier, but quotes from 293 F.Supp.2d 1144.

property, arguably demonstrating at least (1) recklessness with respect to the Brookses' resulting emotional state and (2) a constructive intent to take possession of the property in defiance of the Brookses' rights. Moreover, the items seized from the property, including several vehicles, apparently could not be located and returned to the Brookses once the error had been recognized. Nevertheless, both the value of the items seized and the effect the seizure had on the Brookses' future income were vigorously disputed, and the extent of the Brookses' damages was subject to considerable uncertainty.

Considering the totality of the circumstances, the $100,000.00 paid by Seasons to settle the Brookses' claims against it was not an insignificant sum and was consistent with the avoidance of foreseeable future litigation expenses. The amount that Seasons paid to settle the Brookses' claims against it was therefore reasonable.

2. *Nevertheless, the circuit court abused its discretion by acceding to a settlement that allowed Seasons to accomplish indirectly that which it was expressly barred by law from accomplishing directly.*

HRS § 663–15.5(d)(1) plainly states that "[a] determination by the court that a settlement was made in good faith shall ... [b]ar any other joint tortfeasor ... from any further claims against the settling tortfeasor ..., *except those based on a written indemnity agreement.*" (Emphasis added.) Seasons and the Appellants do not contest the validity of the mutual indemnity agreement between them; what *is* in dispute is the extent to which the agreement binds Seasons in the present matter. Therefore, by the plain language of the statute, any cross-claims brought under the indemnity agreement between them would survive a good faith settlement. To the extent that the Appellants' cross-claims had merit, therefore, Seasons, through its settlement, sought to employ the circuit court to eliminate those cross-claims expressly preserved under HRS § 663–15.5(d)(1).

Considered in the context of a good faith settlement determination, Seasons's argu-

ments that the cross-claims lacked merit are unpersuasive. Holding aside the fact that *Whirlpool* is a federal decision and therefore not a precedent of this court, Seasons misapprehends key differences between the application of contribution and indemnity to joint intentional tortfeasors. In *Whirlpool,* the United States District Court for the District of Hawaiʻi determined that this court, when faced with statutory silence and a question of first impression, often mines the Restatement (Second) for guidance and, hence, relied on the Restatement (Second) of Torts to forecast how this court might rule on the question of *contribution* among joint intentional tortfeasors. 293 F.Supp.2d at 1147–50. The *Whirlpool* court correctly noted that Restatement (Second) of Torts § 886A(3) states that "[t]here is no right of contribution in favor of any tortfeasor who has intentionally caused the harm," 293 F.Supp.2d at 1148, but, in our view, mistakenly included indemnity in that rule. *See* 293 F.Supp.2d at 1151 (finding "that the general rule, as set forth in the Restatement, applies here to bar contribution *and indemnity* claims among joint intentional tortfeasors") (emphasis added).

The *Whirlpool* court failed to note that § 886A(4) states that "[w]hen one tortfeasor has a right of indemnity against another, neither of them has a right of contribution against the other," because, "[w]hen there is a right of indemnity, it controls." Restatement (Second), § 886A(4) and cmt. l. Indemnity is expressly addressed in § 886B, which states in relevant part that:

(1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, *he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability.*
(2) Instances in which indemnity is granted under this principle include the following:

. . . .

(b) The indemnitee acted pursuant to directions of the indemnitor and reasonably believed the directions to be lawful; or]

(c) The indemnitee was induced to act by a misrepresentation on the part of the

indemnitor, upon which he justifiably relied.

*Id.* (Emphasis added.) Restatement (Second) § 886B does not distinguish between intentional and other forms of tort. Accordingly, the Restatement (Second) does not foreclose a right of indemnity for intentional torts in the present matter. *See also* Restatement (Third) of Torts: Apportionment of Liability § 22 (1999 & Supp.2006):

> (a) When two or more persons are or may be liable for the same harm and one of them discharges the liability of another in whole or in part by settlement ..., the person discharging the liability is entitled to recover indemnity in the amount paid to the plaintiff, plus reasonable legal expenses, if:
>
> > (1) the indemnitor has agreed by contract to indemnify the indemnitee....

*Id.*

In addition, by its express terms, the indemnification agreement covers Seasons's negligent actions, *see supra* section I.A. Therefore, the Appellants' cross-claim against Seasons for indemnification would be invalidated only in the event of bad faith on the part of Fidelity or Nance in carrying out the inspections. The record appears to be devoid of any evidence to that effect.

 In adopting and applying the totality of the circumstances test in *Troyer,* this court relied in part on two decisions of the Illinois Supreme Court, *Dubina v. Mesirow Realty Dev., Inc.,* 197 Ill.2d 185, 258 Ill.Dec. 562, 756 N.E.2d 836 (2001), and *In re Guardianship of Babb,* 162 Ill.2d 153, 205 Ill.Dec. 78, 642 N.E.2d 1195 (1994). In both *Dubina* and *Babb,* the Illinois Supreme Court concluded that a settlement agreement that allowed a settling tortfeasor to accomplish indirectly what governing law expressly forbade was collusive and, hence, not in good faith. *Dubina,* 258 Ill.Dec. 562, 756 N.E.2d at 842–43 (noting that, in addition to allowing the settling joint tortfeasor to evade the letter of the law, the settlement did not encourage the Illinois act's purpose of "equitably distributing among all joint tortfeasors the burden of compensating the injured plaintiff"); *Babb,* 205 Ill.Dec. 78, 642 N.E.2d at 1204–05 (noting

that neither the objectives of equitable distribution nor encouraging settlements was furthered by the agreement); *see also Int'l Action Sports, Inc. v. Sabellico,* 573 So.2d 928, 930 (Fla.Dist.Ct.App.1991) (concluding that a settlement agreement was not in good faith in part because the agreement neither encouraged settlements nor equitably apportioned liability), *cited in Troyer,* 102 Hawai'i at 425, 77 P.3d at 109. We hereby adopt the reasoning of the Illinois Supreme Court and hold that a settlement, wherein a party seeks to accomplish indirectly that which it is expressly barred by applicable law from accomplishing directly, is not in good faith.

By the plain language of HRS § 663–15.5(d), *see supra* note 1, a good faith settlement agreement between Seasons and the Brookses would not have disturbed the Appellants' cross-claims against Seasons. Seasons, however, caused an integral condition of settlement to be that those cross-claims against it be dismissed, *see supra* section I.B., which thereby "allow[ed] the settling defendant[ ] to accomplish indirectly that which [it] could not do directly." *Dubina,* 756 N.E.2d at 842.

The record demonstrates that the circuit court strove to balance the competing policy interests at stake and the unresolved factual issues upon which the indemnity agreement's applicability would be ascertained. Nevertheless, by acknowledging that HRS § 663–15.5(d)(1) expressly preserved, under the written indemnity agreement, any cross-claims brought by the Appellants but, nevertheless, acquiescing in a settlement, a central condition of which was the extinguishment of the cross-claims, the circuit court abused its discretion by "disregard[ing] rules or principles of law ... to the substantial detriment of a party,' " *see In re Water Use Permit Applications,* 94 Hawai'i at 183, 9 P.3d at 495. Absent that offending provision, however, the agreement would otherwise have been a good faith settlement, and the circuit court would not have abused its discretion in so determining.

## IV. CONCLUSION

In light of the foregoing, we vacate the circuit court's July 20, 2004 order determin-

ing that the settlement was made in good faith and remand this matter for further proceedings consistent with this opinion.

### Dissenting Opinion by ACOBA, J.

I respectfully disagree (1) that in this case this court has jurisdiction under Hawai'i Revised Statutes (HRS) § 663–15.5(e) (Supp. 2005) to "a review of the good faith determination [because it] entails analysis of the indemnification clause and the strength and vitality of the ... cross-claim [of Defendants–Appellants/Cross–Claimants–Appellants/Cross–Claim Defendants Dana Nance & Company (Nance) and Fidelity National Field Services' (Fidelity National) (collectively, Appellants)] against [Defendant–Appellee/Cross–Claim Defendant–Appellee/Cross–Claimant Seasons Mortgage, Inc. (Seasons)]," majority opinion at 1097–98, (2) that a review of the good faith argument of the circuit court of the second circuit (the court) is necessary in view of the existence of a "written indemnity agreement," *id.* at 1093, and (3) that on appeal, an appropriate abuse of discretion review can be rendered, *id.* at 1102.

The relevant provisions of HRS § 663–15.5 (Supp.2005), entitled "Release; joint tortfeasors; co-obligors; good faith settlement," provide in part that:

(a) A release, dismissal with or without prejudice, or a covenant not to sue or not to enforce a judgment that is given in good faith under subsection (b) to one or more joint tortfeasors, or to one or more co-obligors who are mutually subject to contribution rights, shall:

(1) Not discharge any other joint tortfeasor or co-obligor not released from liability unless its terms so provide;

(2) Reduce the civil claims against the other joint tortfeasor or co-obligor not released in the amount stipulated by the release, dismissal, or covenant, or in the amount of the consideration paid for it, whichever is greater; and

(3) Discharge the party to whom it is given from all liability for any contribution to any other joint tortfeasor or co-obligor.

This subsection shall not apply to co-obligors who have expressly agreed in writing to an apportionment of liability for losses or claims among themselves.

(b) For purposes of subsection (a), *any party shall petition the court for a hearing on the issue of good faith of a settlement* entered into by the plaintiff ... and one or more alleged tortfeasors....

 ....

(d) A determination by the court that a settlement was made in good faith shall:

(1) Bar any other joint tortfeasor ... from any further claims against the settling tortfeasor ...., *except those based on a written indemnity agreement;* and

(2) Result in a dismissal of all cross-claims filed against the settling joint tortfeasor ..., *except those based on a written indemnity agreement.*

(e) *A party aggrieved by a court determination on the issue of good faith may appeal the determination.* ...

(Emphases added.)

### I.

### A.

The July 20, 2004 order as it embodies the court's good faith determination [1] under HRS

---

1. The court's July 20, 2004 "Order Granting Defendant Seasons Mortgage Group, Inc.'s Petition for Determination of Good Faith Settlement" states in relevant part:

> IT IS HEREBY ORDERED, ADJUDGED and DECREED that, in accordance with [HRS] § 663–15.5 and *Hawai'i Rules of Civil Procedure [(HRCP)] 58* and 54(b), and after having determined that there is no just reason for delay in entry of judgment, the Petition of [Seasons] be, and the same hereby is, GRANTED and *the Settlement between [Plaintiffs–Ap-*

*pellees Charles Brooks and Donna Brooks (Plaintiffs)] and [Seasons] is determined to have been made and given in good faith pursuant to HRS § 663–15.5. As such, [Seasons] and those persons and/or entities covered by the release in the Settlement Agreement are discharged and dismissed with prejudice from all claims filed by [Appellants],* and from all claims which may be brought by any other joint tortfeasor or co-obligor having notice of this Petition for any of the damages, injuries or losses sustained by Plaintiffs in connection with or arising out of

§ 663–15.5(e) is not appealable because it fails to satisfy the requirements of HRCP Rule 58.[2] On its face HRS § 663–15.5(e) allows that an aggrieved party "may" appeal from a good faith determination of the circuit court. As noted by the majority, HRS § 641–1 (1993) applies to such an appeal. Majority opinion at 1093 n. 2. HRS § 641–1 states in relevant part:

> (a) Appeals shall be allowed in civil matters from all final judgments, orders, or decrees of circuit ... courts ... to the supreme court ... except as otherwise provided by law....

> ....

> (c) *An appeal shall be taken in the manner and within the time provided by the rules of court.*

HRS § 663–15.5(e) merely allows an appeal to be taken as to a good faith determination. However, HRS § 641–1(c) commands that "[a]n appeal shall be taken in the manner ... provided by the rules of court." HRCP Rule 58 mandates that the July 20, 2004 order must be reduced to a separate judgment. *See Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 119, 120, 869 P.2d 1334, 1338, 1339 (1994) (stating that, "for all appeals from circuit courts filed after March 31, 1994, [this court] will enforce strict compliance with the separate document requirement of HRCP 58" and that "[a]n appeal from an order that is not reduced to a judgment in favor of or against the party by the time the record is filed in the supreme court will be dismissed" (footnote omitted)).[3]

> the matters which are the subject of the Settlement Agreement.
> (Emphases added.)

**2.** HRCP Rule 58, entitled "Entry of Judgment," states in pertinent part, as follows:

> The filing of the judgment in the office of the clerk constitutes the entry of judgment; and the judgment is not effective before such entry. The entry of the judgment shall not be delayed for the taxing of costs. Every judgment shall be set forth on a separate document.

**3.** The purpose of the separate judgment rule under HRCP Rule 58 is to establish the finality of an order for appeal purposes:

> The purpose of the separate judgment provision of HRCP Rule 58 is to implement the

B.

1.

Nonetheless, the majority maintains that under "the plain language of HRCP Rule 58," "the court enter[s] judgment ... (1) upon the verdict of a jury, (2) when a court 'directs that a party recover only money or costs or that all relief be denied,' or (3) 'when the court directs entry of judgment for other relief[,]' ... none of the three categories ... apply," and, thus, that the order is appealable. Majority opinion at 1097–98. But even the court acknowledged that compliance with HRCP Rule 58 was necessary for appeal of the good faith determination to take place.[4]

As set forth in note 1, the court's order states in relevant part that it was issued "*in accordance with* [HRS] § 663–15.5 and [HRCP] 58 and 54(b), and [that] after having determined that there is no just reason for delay in entry of judgment, *the Petition of [Seasons]* be, and the same hereby *is, GRANTED and the Settlement between Plaintiffs and [Seasons] is determined to have been made and given in good faith* pursuant to HRS § 663–15.5." (Emphases added.) (Capitalization in original.) Under the plain language of HRCP Rule 58 and the order, the court obviously "direct[ed] entry of judgment for other relief," in that it "ordered adjudged and decreed" that judgment enter inasmuch as the court "determined there is no just reason for delay in entry of judgment."

> finality rule of HRS § 641–1(a) (1993), which authorizes appeals from "final judgments, orders, or decrees" in circuit court civil cases. *Jenkins,* 76 Hawai'i at 118, 869 P.2d at 1337 ("We are mindful, however, that we may hear appeals from only final judgments, orders, or decrees except as otherwise provided by law. HRS § 641–1(a)."). "The separate judgment rule of HRCP Rule 58 is designed to simplify and make certain the matter of appealability" and "its sole purpose is to determine when the time for appeal commences." *Id.*
> *In re Tax Appeal of Alford,* 109 Hawai'i 14, 21–22, 122 P.3d 809, 816–17 (2005) (brackets omitted).

**4.** Despite the court's order a separate judgment pursuant to HRCP Rule 58 was not filed, however.

The judgment as indicated by the order was entered "as to" the third basis for entry of judgment as prescribed in HRCP Rule 58, i.e., "relief" "other" than the other two bases of "upon the verdict of a jury" or upon a "direct[ion] that a party recover only money or costs or that all relief be denied." Such "other relief" under HRCP Rule 58 plainly encompasses, among other things, a determination of good faith under HRS § 663–15.5. The majority is wrong, then, in arguing that "HRCP Rule 58 ... is inapplicable to the good faith determination process described in HRS § 663–15.5[,]" because "none of the three categories in HRCP Rule 58 apply." Majority opinion at 1098. Plainly, HRCP Rule 58 applies under the language therein and our case law, as the court and parties recognized.

2.

The majority also declares that "the right of appeal under HRS § 663–15.5(e) is distinct and independent under that statutory authority." Id. (footnotes omitted). This is incorrect. First, on its face HRCP Rule 58 applies to "[e]ntry of [j]udgments." In tandem with Rule 58, the court's order, supra, states that the order was also issued pursuant to HRCP Rule 54(b). Rule 54(a) states in relevant part that the term " '[j]udgment' as used in these rules includes a decree and any order from which an appeal lies." (Emphasis added.) Accordingly, judgment may be entered "[w]hen more than one claim for relief is presented in an action, ... or when multiple parties are involved[.]" HRCP Rule 54(b). In such an instance, "the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties [.]" Id. (emphasis added). Therefore, judgments by virtue of HRCP Rules 58 and 54 may be entered "as to ... fewer than all of the claims or parties," as was done in this case.

Second, and hence, as the court and the parties recognized, the order was issued not only pursuant to HRCP Rule 58, but also in accordance with Rule 54(b), precisely because the order resolved the claim between Plaintiffs and Seasons (via the good faith settlement finding) but not claims between Plaintiffs and the other defendants. To reiterate, the court thus directed entry of a final judgment "as to one [ (the claim between Plaintiffs and Seasons) ] ... but fewer than all of the claims or parties" (the claims remaining among Plaintiffs and the other defendants) "upon an express determination that there is no just reason for delay in the entry of judgment." See order supra.

The good faith requirement involved only some but not all of the claims and parties. Thus under HRCP Rules 54 and 58 it was appealable upon the filing of a separate judgment, as the court indicated in its order. Hence, it was not necessary for the legislature to provide a "right of appeal under HRS § 663–15.5(e)" "distinct and independent," majority opinion at 1098 (footnote omitted), of Rule 58 and Rule 54, as the majority implies. See Weinberg v. Mauch, 78 Hawai'i 40, 46 n. 4, 890 P.2d 277, 283 n. 4 (1995) (stating that "if the judgment resolves fewer than all claims against all parties, or reserves any claim for later action by the court, an appeal may be taken only if the judgment contains the language necessary for certification under HRCP 54(b)[,]" and that "an appeal from any judgment will be dismissed as premature if the judgment does not, on its face, either resolve all claims against all parties or contain the finding necessary for certification under HRCP 54(b)" (emphasis in original) (citation omitted)); Cook v. Surety Life Ins., Co., 79 Hawai'i 403, 407, 903 P.2d 708, 712 (App.1995) (stating that, "[g]enerally, an appellate court may only consider an appeal from a final judgment, order or decree[,]" and that "[e]ssentially, [an appellate] court has jurisdiction to consider appeals from: (1) a judgment, order or decree which fully determines the rights of the parties and leaves no matter for further action, (2) an order or decree certified as a final judgment under HRCP Rule 54(b), and (3) a collateral order[ ]" (citations omitted)).

II.

Accordingly, the plain language of HRS § 663–15.5 allows only, as stated supra, that a party may take an appeal at the point where a good faith determination is made, before trial is had upon remaining joint-tort-

feasor claims, for obvious reasons of preventing delay and unnecessary trial of seemingly settled issues. This is the basis for statutorily allowing an appeal before the trial is completed—to "simplify the procedures" and avoid unnecessary costs. Majority opinion at 1098 n. 7 (internal quotation marks and citations omitted).

The legislature did not dispense with the requirements of Rule 54 or Rule 58, and the majority cites nothing to that effect. Nowhere in the language or legislative history of HRS § 663–15.5 is there any abrogation of the rules of procedure that otherwise attend a judgment or an appeal therefrom, as embodied in HRCP Rule 54 and Rule 58. Indeed, the abrogation of a HRCP by the legislature, as the majority appears to imply, may also implicate a constitutional conflict between the courts and the legislature. *Asato v. Furtado*, 52 Haw. 284, 294 n. 6, 474 P.2d 288, 296 n. 6 (1970) ("[S]ince the adoption of the Constitution of the State of Hawai'i, rules of practice and procedure adopted by this court supersede any conflicting provisions to be found in the [HRS] or other legislative enactments. See, for example, the [HRCP] and the Hawai'i Rules of Criminal Procedure, adopted and promulgated by this court.")

## III.

To reiterate, HRCP Rule 58 applies to civil actions "in the circuit courts of the State" and requires that "every judgment shall be set forth on a separate document." An order disposing of a circuit court case is appealable when the order is reduced to a separate judgment. *Jenkins*, 76 Hawai'i at 119, 869 P.2d at 1338. As we have noted, "HRCP Rule 1 states that the HRCP 'govern the procedure in the circuit courts of the State in all suits of civil nature whether cognizable as cases at law or in equity, with the exceptions stated in Rule 81.' " *In re Tax Appeal of Alford*, 109 Hawai'i at 21, 122 P.3d at 816. Also,

> [t]he "circuit courts of the State" are those courts established by HRS § 603–2 (1993). That statute provides that
>
> > there shall be established in each of the four judicial circuits of the State a court with the powers and under the conditions hereinafter set forth, which shall be styled the circuit court of such circuit, as for instance, the circuit court of the third circuit.

*Id.* (brackets omitted). The second circuit court is a circuit court established by HRS § 603–2.

The July 20, 2004 order disposed of the case via the good faith settlement finding. The order was not reduced to a separate judgment. The HRCP requires that that be done. Because this case is "[a]n appeal from an order that [was] not reduced to a judgment in favor of or against the party by the time the record [was] filed in [this court, the appeal should] be dismissed." *Jenkins*, 76 Hawai'i at 120, 869 P.2d at 1339. The appeal, then, was not "taken in the manner ... provided by the rules[.]" HRS § 641–1.

This court has said that, "for all appeals from circuit courts filed after March 31, 1994, [this court has] enforce[d] *strict compliance* with the separate document requirement of HRCP 58." *Jenkins*, 76 Hawai'i at 119, 869 P.2d at 1338 (emphasis added). Hence, there is no jurisdiction to review the order and the instant appeal must be dismissed. *See id.* at 120, 869 P.2d at 1339 (an order that resolves claims in a circuit court civil case is not appealable unless the order is reduced to a separate judgment pursuant to HRCP 58). Whereas this court has strictly enforced the separate judgment requirement of HRCP Rule 58 on innumerable occasions, there is no principled basis for deviation in this instance. The inconsistent application of HRCP Rule 58 in this case, in the context of numerous decisions and orders dismissing appeals for failure to comply with the rule, calls into question the efficacy of *Jenkins* and the equal treatment of litigants.

## IV.

Assuming, *arguendo*, that there is jurisdiction, a good faith review is unnecessary because HRS § 663–15.5 expressly precludes such review in the face of claims "based on a written indemnity agreement." The term "except" means "with the exclusion or exception of[.]" *Webster's Third New Int'l Dictionary* 791 (1961). Under HRS § 663–15.5, a

good faith determination "[b]ar[s] any other joint tortfeasor ... from any further claims against the settling tortfeasor" and "[r]esult[s] in a dismissal of all cross-claims filed against the settling joint tortfeasor," "except those based on a written indemnity agreement." HRS § 661–15.5(d)(1) & (2). The effect of a good faith determination is irrelevant to a disposition of this appeal because claims arising from a "written indemnity agreement" are excluded from the purview of such a determination. It is undisputed that "HRS § 663–15.5(d)(1) expressly preserved, under the written indemnity agreement, any cross-claims brought by the Appellants." Majority opinion at 1102. Therefore, that provision controlled and any discussion of the good faith determination is superfluous.

## V.

The majority nevertheless proceeds to evaluate the good faith determination of the court even though it ultimately "vacate[s] the ... July 20, 2004 order determining that the settlement was made in good faith and remand[s the] matter[.]" *Id.* at 1102.

I do not fault the court for the manner in which it made its determination. As the court stated, "I have looked at *Troyer v. Adams*, [102 Hawai'i 399, 77 P.3d 83 (2003),] which talks about the totality of the circumstances which the court is supposed to look at to determine whether a settlement was made in good faith.... [T]his is up to the discretion of the court to make this determination[.]" Predictably, given the nebulousness of the totality of the circumstances standard from *Troyer,* there is precious little with respect to the salient factors of the case that are identified as supporting the conclusion that the settlement amount was reasonable. The court noted that "the realistic approximation of the total damages has been one of the great difficulties in this case, because there has been, I think, very little in terms of hard evidence as to what the special damages are[.]" Hence, we have little on appeal on which to decide whether in the exercise of the court's discretion, there was abuse or not. This is a consequence of the totality of circumstances standard under which

parties and counsel will be unsure of the type of information necessary to establish a good faith claim. Trial courts will be uncertain of what evaluative factors should be dispositive. *The undifferentiated approach inherent in the majority test would fail to ensure a focused record for appellate review.* The ultimate result of such an approach will engender disparate results among the cases.

*Troyer,* 102 Hawai'i at 436, 77 P.3d at 120 (Acoba, J., dissenting) (emphasis added); *see also* Marion L. Reyes–Burke, *Keeping the (Good) Faith: Hawai'i's Good Faith Settlement after HRS section 15.5 and Troyer v. Adams,* 26 U. Haw. L.Rev. 275, 299 (2003) [hereinafter, *Keeping the (Good) Faith*] (stating that the lack of guidance provided by the *Troyer* majority's approach to good faith determinations "may lead to uncertainty: (1) parties and counsel will be unsure of the type of information necessary to establish a good faith claim; (2) trial courts will be uncertain of what evaluative factors should be dispositive; (3) the undifferentiated approach inherent in the majority's test would fail to ensure a focused record for appellate review; and (4) the result of such an approach will engender disparate results among the cases").

To fill the gap, the majority posits that the settlement "was ... reasonable" because (1) "the $100,000.00 paid by Seasons to settle [Plaintiffs'] claims ... was not an insignificant sum[,]" and (2) "was consistent with the avoidance of foreseeable future litigation expenses." Majority opinion at 1100. As to the first proposition, the court did find that it did not think that "the amount that is being proposed ... is improper or inadequate in any way[,]" and, thus, arguably this might support the majority's statement that the settlement amount "was not an insignificant sum[,]" *id.* at 1100.

However, "not an insignificant sum" is but a conclusion that must be drawn from salient determinative facts or factors. Such facts or factors, however, are not required to be articulated. Thus the "totality of the circumstances" test is not so much a guide, but rather a guise by which settlements can be sustained, without an assessment of the fairness sought to be guaranteed to all parties

by the legislature. *See Troyer,* 102 Hawai'i at 437, 77 P.3d at 121 (Acoba, J., dissenting) (explaining that the good faith settlement procedure for joint tortfeasors and co-obligors under HRS § 663-15.5 seeks to " 'adequately protect[ ] the rights of *all parties involved* ' " (quoting Sen. Stand. Comm. Rep. No. 828, in 2001 Senate Journal, at 1253) (emphasis in original)); *see also Keeping the (Good) Faith,* 26 U. Haw. L.Rev. at 299–300 ("The non-settling tortfeasor . . . also faces an even more difficult standard of review to overcome" because "[t]he *Troyer* majority applied the abuse of discretion standard of review to good faith determinations under HRS section 663-15.5. This high standard imposes the burden of establishing abuse of discretion by a strong showing on the appellant. Thus, under HRS section 663-15.5, the likelihood that a non-settling tortfeasor will successfully challenge a settlement's good faith determination is low.").

The majority's second proposition—that the settlement sum is reasonable because it is "consistent with" "avoid[ing] . . . future litigation expenses," majority opinion at 1100, is something created on appeal since it was not articulated at all by the court as a basis for *its* oral or written decision. In that respect, an abuse of discretion standard similarly cannot be appropriately applied.

## VI.

As our legislature had declared, the " 'procedures proposed by [Act 300, codified as HRS § 663-15.5,] are *based on a system that has been in existence in California for over ten years.*" *Troyer,* 102 Hawai'i at 434, 77 P.3d at 118 (Acoba, J., dissenting) (quoting Hse. Stand. Comm. Rep. No. 1230, in 2001 House Journal, at 1599) (emphasis in original). Thus, "inasmuch as the arguments cited by the majority [in *Troyer* had] been presented and rejected in the California case law, there [was] no rational basis for inferring that the legislature's position would have been otherwise[,]" *id.* (Acoba, J., dissenting), as the majority did in adopting the totality of the circumstances approach. Based on the language of the statute and its legislative history, the Hawai'i Legislature "intended that Hawai'i follow California law

and thus adopt the governing factors listed in *Tech–Bilt, Inc. v. Woodward–Clyde & Assoc.,* [213 Cal.Rptr. 256, 698 P.2d 159 (1985).]" *Id.* (Acoba, J., dissenting).

But under *Troyer,* the court in the instant case was not required to enunciate the key "determination of proportionate liability among the joint tortfeasors . . . crucial to ensuring that the right of all parties are protected" under *Tech–Bilt. Troyer,* 102 Hawai'i at 437, 77 P.3d at 121 (Acoba, J., dissenting). As was observed in *Tech–Bilt,* "a 'primary concern' was that 'in the great majority of cases . . . equity and fairness call for an apportionment of loss between the wrongdoers in proportion to their relative culpability." *Id.* at 436, 77 P.3d at 120 (Acoba, J., dissenting) (quoting *Tech–Bilt,* 213 Cal.Rptr. 256, 698 P.2d at 163) (brackets omitted). Further, *Tech–Bilt* noted that "requiring a proportionate liability assessment would also encourage settlement because 'the settling defendant is induced to offer more in order to bring the settlement within the bounds of fairness, [thus] the plaintiff's incentive to settle may be greater.' " *Id.* (Acoba, J., dissenting) (quoting *Tech–Bilt,* 213 Cal.Rptr. 256, 698 P.2d at 167).

The infirmity of the majority's test is that it "does not compel the [circuit] courts to engage in the inquiry necessary to determine whether the amount contributed by the settling defendant is fairly related to its proportional liability." *Id.* at 438, 77 P.3d 83, 77 P.3d at 122 (Acoba, J., dissenting); *see also Keeping the (Good) Faith,* 26 U. Haw. L.Rev. at 306 ("At present HRS section 663-15.5 and *Troyer* disregard the critical question 'which party caused the injury?' Rather, the current law asks the trier of fact to ignore legal causation (i.e., who legally caused the injury) and simply to determine 'how much [money] liability does the non-settling tortfeasor owe the plaintiff?' *Troyer* disregards the reality that the settling tortfeasor's payment for his release (*i.e.,* settlement) established his status as a 'joint tortfeasor' as a matter of law; *Troyer* likely does not even allow the jury to apportion fault to this settling joint tortfeasor."). Because the evaluation of whether the settlement was in good faith is not tied to proportionate fault, the standard fails to require the parties or the

circuit courts to focus on a realistic assessment of the case. The failure to mandate an analysis of the proportionate allocation of risk leads to a disproportionate distribution of the cost burdens in tort cases and in the long run is detrimental to the efficacy of the tort system.

## VII.

Finally, by concluding that "[t]he amount that Seasons paid to settle [Plaintiffs'] claim against it was therefore reasonable[,]" majority opinion at 1100, but nevertheless vacating and remanding the court's good faith determination, the majority has colored and improperly influenced the subsequent proceedings on remand—whether by settlement or by trial—despite its vacation and remand of the court's good faith order. The effect of the majority's pronouncement as to the amount of $100,000 is to render the case more difficult to settle, as the parties seek to divine what action this court may take in the future in light of the majority's affirmation of fault, damages, and reasonableness, or as a result thereof, to unfairly prejudice Seasons' positions in whatever settlement negotiations, or trial may follow. Accordingly, I respectfully dissent.